UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) <br> ) <br> ) |
| v. | ) Case No. 21-cr-10292-ADB <br> ) |
| STEPHEN DeBERARDINIS | ) <br> ) |
| Defendant. | ) |

## UNITED STATES' SENTENCING MEMORANDUM

Defendant Stephen DeBerardinis has spent 24 years committing crimes and receiving consequences. When he committed the instant crimes, he already had over 100 entries on his criminal record and had served multiple sentences of incarceration. Yet he still decided to harass and threaten a white woman and a Black man with racist epithets and horrifying physical and sexual violence, simply because they were in an interracial relationship and had announced their engagement to be married. It is time to stop this defendant from inflicting further violence on members of this community. Given that prior criminal consequences, including jail sentences, have not deterred this defendant from his ongoing and relentless criminal behavior, this Court must impose a significant punishment.

Consequently, the United States recommends that this Court sentence DeBerardinis to 90 months of incarceration, a subsequent three years of supervised release, restitution, a fine within the guidelines range if the Court finds he is able to pay, and a mandatory special assessment of $300.

## BACKGROUND AND OFFENSE CONDUCT

The facts are familiar from the plea and the presentence report. The following facts therefore highlight factual issues specifically relevant to sentencing.

A. **Defendant's Prior Criminal Conduct**

DeBerardinis has lived with his mother and other family members in the same house his entire life. PSR ¶ 108. He has a certificate of completion from high school and he told probation "his basic needs were always met and the family did not experience any financial hardship." PSR ¶ 101.

Despite these advantages, DeBerardinis has a history of violence, hate-motivated conduct, and victimizing others. As this Court previously noted, "DeBerardinis has a lengthy and serious criminal record that 'spans over two decades and has over 100 hundred entries and more than 30 convictions in at least 15 different courts,' and includes many violent offenses." *See* ECF No. 51 (Memorandum and Order on Defendant's Appeal of Detention Order, issued by the District Court on February 17, 2022) at 6 (quoting, in part, the decision of M.J. Bowler). The defendant's extensive criminal record includes prior state convictions for threats, intimidation, false reports of a crime, impersonation, larceny, among many other crimes. PSR ¶¶ 43-98. He was convicted of many of these offenses multiple times. *Id*. Prior consequences for his criminal behavior appear to have had no deterrent effect. The defendant has also demonstrated a "repeated failure to respect legal authority" (ECF No. 51 at 7), particularly given that he previously violated his terms of probation approximately 28 times.[1]

"Perhaps most striking is that the defendant's conduct also resulted in 12 individuals taking out 13 restraining orders against him, including two lifetime orders." ECF No. 51 at 3 (quoting M.J. Bowler); PSR ¶¶ 104, 110, 115, 116. He was convicted of violating those restraining orders on at least five occasions. ECF No. 51 at 6; PSR ¶¶ 47, 61, 62, 68, 73, and 75.

---

[1] *See* PSR ¶¶ 45 (two violations), 48, 49, 51, 55, 56 (two violations), 57 (two violations), 61, 62, 63, 64, 65, 66, 67, 69 (two violations), 70, 71 (three violations), 72, 74, and 75 (three violations).

Individuals who feared the defendant enough to seek restraining orders against him include his mother, his daughter, and multiple ex-girlfriends. PSR ¶¶ 110, 115, 116.

According to the PSR (¶¶ 43-98), the two-and-a-half years since these federal charges were filed is the longest period of time the defendant has ever gone without being arrested since 1997, when he was 21 years old. And the defendant was likely only able to avoid committing crimes and being arrested for the last two-and-a-half years because he has been in jail.

The defendant reports that just prior to resolving this case by pleading guilty, he disclosed for the first time that he was sexually abused by his stepfather as a child. PSR ¶ 103. While the government certainly has empathy for survivors of abuse, the fact remains that most survivors do not go on to commit crimes. Instead of seeking treatment, the defendant earned over 100 entries on his criminal record, choosing to victimize others rather than address his alleged victimization.

### B. Defendant's Threats and Attempts to Obstruct in This Case

In late December 2020, Victim 1, a white woman, and Victim 2, a Black man, got engaged to be married. PSR ¶ 9. Victim 1 announced her engagement on her Facebook page and included in her announcement photos of her and her fiancé. *Id*.

One the evening of January 6, 2021, DeBerardinis saw a photo on Facebook of a happily engaged couple and decided to send them hate-filled threats of physical and sexual violence, even though he had never met them. PSR ¶¶ 9-13. Instead of congratulating them on their engagement, he sent them a message calling them "niggers," and used other racial language and expletives to harass and offend the victims, specifically because they were an interracial couple. *Id*. When the Victims responded by telling DeBerardinis that they were going to report him to law enforcement (PSR ¶ 13), he elevated his language to threats, sending the Victims a picture of

3

brass knuckles with the words "snitches get stitches" around it; telling them, *inter alia*, that he "burn[s] niggers alive;" and threatening to rape and kill them, cut off their body parts, and mail the body parts to their families. PSR ¶¶14-15. The language the defendant used makes it clear that the defendant intentionally selected these Victims to threaten and obstruct because of their race – because he saw a photo showing that they were in an interracial relationship. PSR ¶¶ 9-15.

Earlier that same day – January 6, 2021 – hundreds of rioters, many of whom have been prosecuted for their crimes, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Among other things, the rioters engaged in physical violence against law enforcement officers and destroyed property. *See generally United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law."). Many Americans watched the events of January 6, 2021 as they were happening. Some of the Capitol rioters could be seen displaying symbols or using language of race-based hatred or bias against Black people. For example, on January 6, 2021, a large noose and gallows was displayed outside the Capitol, some rioters carried Confederate flags, and some rioters openly displayed symbols of white supremacy. *See e.g.,* https://www.nytimes.com/2022/06/16/us/politics/jan-6-gallows.html.

When the Victims received DeBerardinis's threats, they were afraid, and they had good reason to be. Hundreds of people had attacked the nation's Capitol just hours before, some displaying overt signs and statements of racism, so they were already feeling anxious and unsettled. And DeBerardinis was brazen with his threats – he used what appeared to be (and turned out to be) his own Facebook account to send the threats in his real name. The Victims

could search the internet and easily learn that DeBerardinis lived in the Boston area, only a short distance from where they were living at the time. He hadn't threatened to burn, rape, and kill them from across the world; in fact he was just a few miles away.

### C. The Defendant's Threats to Others

DeBerardinis did not regret making these threats to the Victims. In fact, it was just the opposite. He continued making threats months later, including to a journalist who wrote an unflattering article about him shortly before he was arrested for the charged conduct. *See* ECF No. 47 (Government's Response to Defendant's Appeal of Detention Order) at 3-4; PSR ¶ 39. On September 15, 2021, a journalist ("Journalist") saw the defendant trying to punch protestors at a rally. ECF No. 47-48. The police had to restrain the defendant. *Id*. The Journalist published a story that included a photograph of the defendant with the caption "*Police supporter getting dragged away after failing to punch some protesters in West Roxbury*." *Id*. The defendant then sent the Journalist emails saying: "ARE YOU PEOPLE THAT FUCKING RETARDED!?!?!?!? WATCH YOUR SELF VUZ IMA COME FOR YOU AND IMA COME FOR YOUR HARD HAHAHAHAHAHA." PSR ¶ 39. After the Journalist looked the defendant up and responded, "Preciate the kind thoughts, Steve," the defendant wrote, "Hey!!! Not a problem you fucking nigger." and "AND NOW THAT I KNOW WHAT YOU LOOK LIKE HAHAHAHAHAHA ITS ON MOTHERFUCKER." PSR ¶ 39. The Journalist was afraid when he received the threats, because he perceived DeBerardinis's emails as true threats of physical harm. *Id*.[2]

---

[2] The Probation office notes that USSG § 5K2.21 allows the Court to depart upward to reflect the uncharged threats that DeBerardinis sent to the Journalist. PSR ¶ 41. While the government is not affirmatively recommending an upward variance, it would not oppose if the Court chose to vary upward based on this information.

D. **DeBerardinis's Hate**

The hate-filled threats that DeBerardinis directed to these Victims are reflections of beliefs that DeBerardinis has expressed repeatedly to others. For example, DeBerardinis's Facebook account contained the following statements of the defendant:



ECF 49-1 (Government's Exhibit 1 in the January 27, 2022 Detention Hearing before the District Court). The above are only a sampling of DeBerardinis's hate-filled statements in that social media account. The first comment in particular reflects DeBerardinis's longstanding bias against

6

interracial couples, calling a white woman who was dating a man of color "gross" and "nasty." Notably, there is nothing in the defendant's Facebook account to indicate this comment has any relation to the Victims in this case – in fact the defendant posted this comment in March 2020, nine months before the Victims posted their engagement photo that resulted in the defendant harassing and threatening them. DeBerardinis's record of racial animosity demonstrates that his threats to the Victims were not a mistake, not a joke, and not out of character.

Finally, any attempt to mitigate this conduct by arguing that DeBerardinis did not carry out his threats of harm should carry no weight. The injury happened the moment he sent those frightening and vile messages, telling the Victims that because of the color of their skin, he would burn, rape, and kill them. On January 6, 2021, DeBerardinis wanted to make an interracial couple feel afraid, and he succeeded. Because the defendant had threatened people before (*see, e.g.*, PSR ¶¶ 43, 61, 70, 91, 95, and 104) and knows how people respond to threats, he knew that the Victims would feel fear upon receipt of his threats. The Victims were injured by the defendant's conduct – they were afraid at the time he committed these crimes, and they are still afraid today. *See United States v. Austad*, 519 F.3d 431, 436 n. 6 (8th Cir. 2008) ("the threat itself causes emotional turmoil in the lives of those threatened, including their families, and is, therefore, itself a crime.").

E. **DeBerardinis's Possession of Weapons**

When the FBI arrested DeBerardinis on these charges, the FBI found in his home over 70 knives, 22 brass knuckles, swords, bullets, black powder for guns, stun guns, rifles, and a number of other weapons. PSR ¶ 40; ECF No. 49-4 (Government's Exhibit 4 in January 27, 2022 Detention Hearing before the District Court). While DeBerardinis was not charged with using these weapons to commit a crime, his threats of violence certainly contemplated the use of these

weapons. In particular, the defendant sent a threat to Victims 1 and 2 that included a picture of brass knuckles, of which he had ample supply in his home, and he also threatened to cut off their body parts and send them to their families, which he could have accomplished with any of his dozens of knives. DeBerardinis also demonstrates his affection toward firearms in his Facebook account, which contains photos of firearms. ECF No. 51 at 6.

## U.S. SENTENCING GUIDELINES CALCULATION

While the U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G.") are advisory and not mandatory, *United States v. Booker,* 543 U.S. 220 (2005), the First Circuit has made clear that "the guidelines still play an important role in the sentencing procedure, so that [ ] a court should ordinarily begin by calculating the applicable guideline range." *United States v. Gilman*, 478 F.3d 440, 445 (1st Cir. 2007). U.S. Probation has calculated the applicable guideline range to be 84-105 months. PSR ¶ 150. The government agrees with that calculation.

## THE GOVERNMENT'S SENTENCING RECOMMENDATION

The government recommends a sentence of 90 months, which is within the guideline range. The government further recommends that the Court sentence DeBerardinis to 36 months of supervised release to follow his incarceration and that in addition to all of the conditions recommended by the Probation Office (PSR at pp. 45-46) the Court also include the following conditions for supervised release:

1. The defendant may not possess or have in the home any firearm, ammunition, or dangerous weapon, including but not limited to powder guns, knives (other than kitchen knives), and brass knuckles;

2. Educational classes or community service directly related to the community harmed by the defendant's offense;

3. Monitoring of cell phone and other electronic devices by U.S. Probation; and

4. A stay-away-no-contact order as to the Victims and the Journalist.

Section 3553(a) of Title 18 specifies the factors courts are to consider in imposing a sentence and instructs courts to "impose a sentence sufficient, but not greater than necessary, to comply with" the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation. 18 U.S.C. § 3553(a). Section 3553(a) then directs a sentencing court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as "the need for the sentence imposed" to serve the four overarching aims of sentencing. §§ 3553(a)(1), (2)(A)–(D); *see Gall v. United States,* 552 U.S. 38, 50, n. 6 (2007). The Court must also consider the pertinent guidelines and policies adopted by the Sentencing Commission. §§ 3553(a)(4), (5); *see Gall*, 552 U.S. at 50, n. 6.

A sentence of 90 months of imprisonment is appropriate because the defendant's offenses were serious, he has a long history of criminal acts that include violence and victimization, he poses a significant risk of reoffending, and he deserves punishment for continuing to disrespect the law and other people. In addition, the Court should impose this sentence to deter others with the defendant's criminal inclinations from acting on those inclinations.

A. **The Nature and Circumstances of the Offense and Defendant's Characteristics (18 U.S.C. § 3553(a)(1))**

   1. *Nature and Circumstances of the Offense*

There can be no question that DeBerardinis engaged in egregious and vile crimes that traumatized the Victims. On January 6, 2021, just after a violent mob invaded the U.S. Capitol, DeBerardinis used Facebook to harass the Victims with racist invective and then, after they told him they would report him to law enforcement, he began to threaten them with horrific violence. DeBerardinis chose the Victims as his targets because he saw their engagement announcement –

9

with a photo of a Black man and a white woman, attached hereto as Exhibit A.[3] He chose to harass and threaten them because they were in an interracial relationship. DeBerardinis acted to instill fear in the Victims because of the color of their skin and because of who they love. DeBerardinis's desire to make people feel scared is abhorrent and deserving of punishment.

### 2. *History and Characteristics of the Defendant*

DeBerardinis has 19 Criminal History Points. PSR ¶ 78. That places him in Criminal History Category VI, which requires 13 or more Criminal History Points. This defendant is a prime example of why repeat offenders deserve and require higher punishments. As the Guidelines instruct:

> A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment. General deterrence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each recurrence. To protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered. Repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation.

U.S.S.G. Introductory Commentary to Chapter 4 Part A.

Obtaining 19 Criminal History Points is a rare and appalling distinction. If there were a Criminal History category that exceeded CHC VI, the defendant would be in it. The defendant's record shows that he has previously received at least two dozen sentences of incarceration ranging from 30 days to two years (PSR ¶¶ 45-74). But these prior consequences have utterly failed to deter DeBerardinis from his criminal conduct. Instead the opposite happened – he continued to commit crimes and his crimes got more serious, resulting in his current situation of

---

[3] The government is seeking to file Exhibit A under seal, pursuant to the protective order (ECF No. 42) entered in this case.

facing significant federal time as a result of his serious federal crimes and his atrocious criminal history.

The government acknowledges that DeBerardinis presents some mitigating factors, including mental health issues and alleged abuse as a child. Absent these factors, the government would have recommended an above-Guidelines sentence, particularly given the defendant's criminal history. *See* U.S.S.G. §4A1.3(a) (setting forth circumstances where upward departures may be appropriate based on a defendant's criminal history). The government does not believe that these factors warrant a sentence lower than 90 months.

B. **The Need for Sentence Imposed** (18 U.S.C. § 3553(a)(2))

1. *To Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment (18 U.S.C. § 3553(a)(2)(A))*

These are serious offenses that merit a sentence commensurate with the harm the defendant caused. In Count 1, the defendant used Facebook to transmit over interstate commerce threats to injure the Victims because they were in an interracial relationship. These threats were:

- "SNITCHES GET STITCHES"
- "Read up more on me lol… you will see how me and me crew burn niggers alive"
- "And white whores like you well…. Get rape and killed THAN we cut off body parts and mail them to your family lol"

He sent these threats to provoke a reaction. He succeeded. The Victims were concerned, they contacted law enforcement agencies, and those agencies spent significant resources investigating him.

In Counts 2 and 3, after the Victims told the defendant they would report him to the police, the defendant used Facebook to intimidate, threaten, and harass the Victims with the intent to hinder, delay, and prevent them from reporting him to law enforcement.

11

Departing from the Guidelines in this case would not convey just punishment to the Victims or to the rest of society. The Victims deserve better.

2. *General Deterrence (18 U.S.C. § 3553(a)(2)(B))*

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence. *See, e.g., United States v. Pettaway*, 560 F. App'x 172, 174 (4th Cir. 2014) (high end sentence was necessary to provide deterrence and protect the public, based on defendant's history of sending threats); *United States v. Houghtaling*, 390 F. App'x 604, 608 (7th Cir. 2010) (upholding an above-guidelines sentence for a defendant who "[b]y targeting such a victim and lacing the threat with vile racist and anti-Semitic hatred, Houghtaling earned the district court's decision to treat his crime as unusually cruel.").

A significant sentence in this case is necessary to deter the criminal conduct of others, that is, to deter those who might otherwise be inclined to send racially charged threats to members of this community. In the internet age, people can level serious threats of violence with the click of a button. It is beyond question that the use of the n-word is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination. This word is perhaps the most offensive and inflammatory racial slur in the English language and its use in this context can only be expressive of racial hatred and bigotry. DeBerardinis's racially motivated acts of hatred and violence in this case are representative of the type of intolerant and racist attitudes that belong to a long-forgotten era. This Court is in the position to send a loud and clear message that racist hate and violence is repulsive, unacceptable in our community, and deserving of punishment.

### 3. *Specific Deterrence (18 U.S.C. § 3553(a)(2)(C))*

A 90-month sentence will serve to protect the public by specifically preventing DeBerardinis from reoffending. DeBerardinis was not deterred by the many state convictions and jail sentences he received for threatening people and other crimes he committed in the past. None of this dissuaded him from terrorizing the Victims. A strong message from this Court is necessary to prevent and deter DeBerardinis from engaging in this conduct in the future. *See United States v. Houghtaling*, 390 F. App'x 604, 608 (7th Cir. 2010) (holding "the need to protect the public was obvious" and "[t]he need to incapacitate [the defendant] alone could be a sufficient reason to impose a sentence at the statutory maximum" where a defendant in Criminal History Category VI who sent threats to a judge was sentenced above the Guideline range).

Unfortunately, the defendant's original motives for his hate crimes persist. As demonstrated by his social media activity, bigotry and racial animus have been part of DeBerardinis's character for some time. If anything, his bigotry and animus have likely increased now that they have landed him in jail. Those characteristics, combined with his history of violence and victimizing others, suggest that he will victimize others after prison.

The defendant's risk of reoffending will not decrease just because he will return home to a loving family. That same loving family was there in 2021 when he committed the instant crimes, and for decades before that when he amassed the 100-plus entries on his criminal record. Nothing suggests that his family will serve him better the next time around. Simply put, 90-month sentence is necessary to protect the Victims and the public from DeBerardinis.

C. **Restitution**

Pursuant to the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A(c)(1)(A)(i), restitution in this case is mandatory, as the defendant committed a crime of

13

violence. *See* 18 U.S.C. § 16 (defining a crime of violence as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another").

The government asks this Court to order restitution to Victim 1 and Victim 2 in the amount of $500 to reimburse the Victims for lost income, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense. The Victims are both self-employed, so lost income is difficult to calculate, but the government believes that they lost at least $500 in income, transportation, and other expenses for participating in this case. In addition, the Victims spent approximately $5,000 on home security measures, which was a direct, proximate, and foreseeable result of the defendant's criminal conduct. 18 U.S.C. § 3663A. The purpose of restitution under the MVRA is to make whole victims of crimes (*United States v. Soto*, 799 F.3d 68, 98 (1st Cir. 2015)), and the Victims in this case would not have spent money on increased security if DeBerardinis had not threatened to kill and rape them because of the color of their skin and who they love. Ordering restitution for those expenditures puts the Victims back in the financial position that would have been had the defendant never committed these crimes. *See United States v. McNeil*, 744 F. App'x 941, 944 (6th Cir. 2018) (upholding a restitution award to victims related to their home security costs after the defendant threatened them over social media); *but see United States v. Maynard*, 743 F.3d 374, 381 (2d Cir. 2014) (holding that a bank that was a victim of a robbery could not receive restitution for the cost of an additional security guard because there was no "plausible showing that a second robbery of this branch by these defendants was such an imminent peril or a risk…"); *United States v. Morelli*, No. 3:22-CR-115 (BKS), 2023 WL 11198143, at *5 (N.D.N.Y. Nov. 14, 2023) (holding, in a threats case, that the

Court does not have authority to order restitution for the victim's personal security enhancements).

### D. Conditions of Supervised Release

As set forth above, the government recommends that the Court order all the standard conditions of supervised release pursuant to USSG §§ 5D1.3(c) and 5B1.3(c) as well as the conditions recommended by Probation in the PSR at pages 45-46. In addition, the government recommends the Court also order the following conditions:

> a. *The defendant may not possess or have in the home any firearm, ammunition, or dangerous weapon, including but not limited to powder guns, knives (other than kitchen knives), and brass knuckles*

Allowing this defendant to have access to dangerous weapons while on supervised release would create a significant risk to the community and to the probation officers who are required to visit his home. Given the defendant's criminal history and high risk of recidivism, he simply should not have access to dangerous weapons. The government asks that the Court include such a prohibition in his conditions of supervised release to protect the safety of the community and the probation officers supervising him.

> b. *Educational classes or community service directly related to the community harmed by the defendant's offense*

While the defendant was not convicted under a hate crime statute, there is no doubt that he intentionally selected his Victims because of their race – specifically because they were a Black man and a white woman announcing their engagement to be married. This is evidenced by the fact the DeBerardinis did not know them, but was able to see their photo, and then targeted them with offensive and violent comments on their race and their relationship. The Probation Office correctly notes that USSG § 3A1.1(a), the "hate crime enhancement," applies.

When a Court sentences a defendant under 18 U.S.C. § 249 (the Shepard-Byrd Hate Crimes Prevention Act), section 249(e) specifically notes that the Court "may order, as an explicit condition of supervised release, that the defendant undertake educational classes or community service directly related to the community harmed by the defendant's offense." While DeBerardinis was not convicted under this statute, he did commit a crime of hate, and therefore the government recommends that the Court impose a condition of supervised release requiring him to take educational classes related to (1) the Black community and interracial relationships; and (2) anger management.

   c. *Monitoring of Cell Phone and other Electronic Devices by U.S. Probation*

Given the defendant's criminal history and likelihood of reoffending, in combination with the fact that he used an electronic device both to find his victims and to commit these crimes, the government recommends that the Court include as a condition of supervised release that the Probation Office monitor the defendant's electronic devices. This need for this condition is supported by the defendant's history and characteristics under 18 U.S.C. § 3553(a)(1) and by the need to protect the Victims and others from the defendant under 18 U.S.C. § 3553(a)(2)(C). *See United States v. Hayes*, 283 F. App'x 589, 594 (9th Cir. 2008) (upholding a similar condition for a defendant who had threatened people via text message in the past and noting that "computers offer anonymity and a convenient means of continued harassment") (cleaned up).

   d. *A stay-away-no-contact order as to the Victims and the Journalist.*

The probation office recommended, and the government agrees, that the Court include a condition of supervised release requiring the defendant to have no contact, direct or indirect, with the Victims. PSR p. 45. The government respectfully asks the Court to add a condition that the

16

defendant also have no contact, direct or indirect, with the Journalist who he also threatened just prior to his arrest. *See supra* at 5-6.

## CONCLUSION

For the reasons set forth herein, the United States respectfully requests the Court apply the Sentencing Guidelines, as outlined above, follow the statutory directives set out in 18 U.S.C. § 3553(a), and impose a sentence of 90 months' imprisonment followed by a three-year term of supervised release, restitution of $5,500, a fine within the guidelines sentencing range if the Court finds the defendant able to pay, and a mandatory special assessment of $300.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

*/s/ Torey B. Cummings*
Nadine Pellegrini
Torey B. Cummings
Assistant U.S. Attorneys

Dated: June 2, 2024

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Torey B. Cummings*
Torey B. Cummings
Assistant United States Attorney

June 2, 2024