United States District Court
District of Massachusetts

UNITED STATES OF AMERICA

vs.                                                                 Docket No. 21-cr-10292-ADB

STEPHEN M. DeBERARDINIS

### DEFENDANT'S SENTENCING MEMORANDUM

At issue is the appropriate sentence for a non-violent racist act by a long-term mentally ill individual. There is no disputing that Stephen DeBerardinis broke the law and threatened harm against a couple who deserved nothing but support and well wishes. However, our repugnance at the action should not lead us to ignore the context. This occurred on January 6, 2021, a day upon which many other regrettable acts occurred. Our overtly hateful and racist president, Donald Trump was inciting his followers on this very day.  This was after years of normalizing hate.[1] Racists were welcomed and even celebrated by our president. Neo-Nazis could be "very fine people."[2]  It is not surprising that a drunk, mentally ill white man sitting alone in his room would believe his views were now normalized. Was he wrong? At the time of sentencing, Donald Trump will be the Republican nominee for President. One week after he announced his candidacy in 2022, he met with supporters the DOJ has labeled white supremacists.[3]

---

[1] New Hate and Old:  The Changing Face of American White Supremacy, ADL 09/20/2018 ("Though aspects of the alt right date back to 2008, it was Donald Trump's entry in 2015 into the 2016 presidential race that really energized the alt right and caused it to become highly active in support of Trump. Available at: https://www.adl.org/resources/report/new-hate-and-old-changing-face-american-white-supremacy.
[2] https://www.congress.gov/118/meeting/house/116973/documents/HHRG-118-ED00-20240417-SD006.pdf.
[3] https://www.pbs.org/newshour/show/trump-dines-with-white-supremacist-renewing-questions-about-gops-leadership-and-values.

1

The Government may argue this is not relevant. However, one cannot remove a crime from its time. One cannot turn a blind eye to the intended influences that the powerful visited on the weak. A famous Massachusetts political consultant once said, "we put all the haters in one pot, and let it boil."[4] This unfortunately viable political strategy catches up many victims. In this case the Defendant and the victims.

It is true that people cannot be allowed to sit online and sow fear in others, and the defendant does not dispute the need for punishment. However, when fashioning punishment for a relatively new scourge it is important not to overreact. The clampdown on crack serves as a good example: no one denies that crack was a serious problem that authorities needed to deal with, however, the response led to injustice and a failure to look at individuals. Similarly, cyber criminals are a problem the authorities are seeking to deal with. However, we must not lose sight of the individual.

Contrary to initial impressions, Stephen DeBerardinis is in many ways typical of defendants who come before this Court. Like many, he was physically, verbally and sexually abused by a family member as a child. Like many he suffers from alcoholism. Like many, he has had multiple psychiatric hospitalizations, and arrests. He is someone who is in desperate need of support if he is to lead a full and productive life. Neither his violation of the law, nor his offensive views, change the fact that he is a fellow human being deserving of sympathy who can get on a better path forward with the appropriate help.

He gravitated to hateful groups on the Internet for a sense of belonging, and to avoid his real world problems, and crossed the line into criminal behavior when he participated in making an on-line threat, specifically, sending threatening and racist messages on Facebook Messenger. Crucially, there is no evidence he (1) took any tangible steps to carry

---

[4] Boston Globe, Oct. 9, 1978, Q&A With Hatch.

out the threat; or (2) engaged in any related acts of violence. This is so even though approximately 8 months elapsed between the time the threat was first communicated and Mr. DeBerardinis' arrest.

Mr. DeBerardinis should be punished for his conduct, but the punishment here should reflect the crime and his history. While no threat is acceptable, Mr. DeBerardinis' conduct falls at the less egregious end of the spectrum of threats cases. More serious threats cases involve repeated harassment or accompanying conduct that evince the capacity or intent to act on the threat. These aggravating facts are not present here. Aside from the particular threats made on Facebook, which undoubtedly are alarming, defendant notes that they are also discreet and never repeated. Mr. DeBerardinis is never alleged to have contacted the victims again, never alleged to have gone to their home, called, or engaged in any other criminal conduct regarding them.

Similarly, the defendant's offensive views do not make his case more aggravated for purposes of sentencing. See United States v. Brown, 479 F.2d 1170, 1174 (2d Cir. 1973) ("[B]as[ing] [a] sentence on ... revulsion arising out of [a defendant's] social or political views ... would be improper."). Threats cases invariably implicate broader values – many relate to the functioning of our justice or political system.

Based on Mr. DeBerardinis' conduct and history, a below guidelines sentence is appropriate, whether based on a departure or variance. His offense is not aggravated, and his criminal record is mainly related to mental health issues. Assuring that Mr. DeBerardinis gets treatment and requiring him to become a productive member of society will go further toward meeting the purposes of sentencing than keeping him in jail for several more years. Mr. DeBerardinis' lack of purpose, goals, structure, and anything resembling accountability and real-world connection doubtless fueled his descent into the dark corners of the Internet and addressing these issues sooner rather than later will

advance Section 3553's goals more than prison ever could.

## PERSONAL HISTORY

A lifelong resident of Massachusetts, Mr. DeBerardinis has a young son and strong family ties to Massachusetts. His fiancée, Lindsey Walsh, and his mother, Shirley DeBerardinis, continue to be actively involved in supporting him. Prior to his detention, he resided with his mother, sister and nieces and nephews at the family home, built by his father, in Hyde Park. He cared for his son Mario and stepson Dylan so his fiancée could work at her small business, and provided support for his sister in the rearing of her children. In the past Mr. DeBerardinis has worked outside the home minimally by selling items at flea markets.

### Mental Illness

When Mr. DeBerardinis was 8 years old, he began receiving weekly counseling (PSR ¶ 124). It is of note that his counseling at school occurred around the same time he reports that his stepfather was abusing him. He recalls being prescribed psychiatric medications for attention deficit disorder but did not have any follow up treatment until he was in his twenties.

Mr. DeBerardinis was an inpatient in psychiatric facilities on multiple occasions, beginning when he was about a young adult; including being hospitalized at the Arbour Fuller, Worcester State Hospital and Bridgewater State Hospital as well as the Norwood Hospital and the Faulkner. Mr. DeBerardinis tried to kill himself on two occasions via overdoses, in 1999 and 2004.

In the past, Mr. DeBerardinis was prescribed multiple psychiatric medications to treat the symptoms of a mental illness. Prior to his instant incarceration he was taking Adderall, Trazadone and Wellbutrin, medications designed to address issues related to attention deficit disorder, depression and anxiety. He was being followed by Dr. Gupta, a

psychiatrist at the Faulkner Hospital in Boston. However, since his admission to PCCF, he has not been prescribed any psychiatric medications, including those listed above that he was taking prior to the governing offense. He does continue to take Tegretol, a medication designed to control seizures.

Diagnoses in the past have varied from Bipolar Disorder, PTSD, Depression, and Schizophrenia. At the request of undersigned counsel, Mr. DeBerardinis was evaluated a clinical and forensic psychologist, Leonard A. Bard, Ph.D., who has opined that Mr. DeBerardinis can be diagnosed with a Borderline Personality Disorder (BPD) and Persistent Depressive Disorder, and possibly with Bipolar Disorder.[5]

**Offense Conduct**

The offense conduct in many ways speaks to the false sense of importance Mr. DeBerardinis felt in his online world. The victims were an engaged a couple he had not met but one of whom had a mutual Facebook Friend. Mr. DeBerardinis at this point was spending his days and nights posting and sharing racist and otherwise offensive imagery online. There is no evidence Mr. DeBerardinis took any further action beyond the posting on Facebook Messenger.

Mr. DeBerardinis' Facebook account did contain racial epithets and photos of weapons. While these images are troubling, other than the threat that is the basis of this case, they were not criminal. As the Second Circuit explained in the case involving a defendant's on-line chats about murdering and cannibalizing his wife:

> Although it is increasingly challenging to identify [the "line between fantasy and criminal intent"] in the Internet age, it still exists and it must be rationally discernible in order to ensure that a "person's inclinations and fantasies are his own and beyond the reach of the government." Jacobson v. United States, 503 U.S. 540, 551–52 (1992). We are loath to give the government the power to punish us for our thoughts and not our actions. Stanley v. Georgia, 394 U.S. 557, 565

---

[5] Dr. Bard's report is being filed with this Court as a sealed exhibit.

5

> (1969). Fantasizing about committing a crime, even a crime of violence against a real person whom you know, is not a crime. This does not mean that fantasies are harmless. … Yet we must not forget that in a free and functioning society, not every harm is meant to be addressed with the federal criminal law.

United States v. Valle, 807 F.3d 508, 511 (2d Cir. 2015). So too is it here. The defendant's other online postings are simply beyond the reach of the law. Though he surely crossed the line in connection with the charged conduct, his sentence must be based on that conduct.

### Length of Sentence

Mr. DeBerardinis' present time in custody, over 32 months, is the lengthiest term he has ever been in jail. His longest prior sentence was 2 years (see PSR ¶ 63), of which he served 13 months. A sentence of 48 months will be more than double what he has previously faced. There is nothing to suggest a sentence beyond 48 months, followed by home detention for 18 months, is necessary here, where Mr. DeBerardinis has already been in jail longer than ever before. His time in jail represents adequate deterrence.

### I. The Sentencing Framework

The Court should impose a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing, by considering the factors enumerated in 18 U.S.C. § 3553(a). In the advisory guidelines regime, it is now well established that the guidelines serve only as a starting point in the Court's analysis, and should not be presumed to yield the appropriate sentence in any given case. *See Nelson v. United States*, 555 U.S. 35, 351 (2009); *Gall v. United States*, 552 U.S. 38, 49 (2007).

Regardless of whether the Court deems a departure or variance appropriate, the defense submits a Guidelines sentence would be "greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553. As noted above, the defendant's conduct here was limited and involved no conduct indicative of an intent to carry out the threat. The Internet became Mr. DeBerardinis' escape from the other negative influences in his life and he

descended into a rabbit hole of hate and extremism. He recognizes what he did was wrong.

He has lived as a functioning adult in the real world when he is under supervision. The most important aspect of any sentence the Court imposes – in terms not only of rehabilitation but protection of the public – will be addressing Mr. DeBerardinis' mental health problems and requiring him to become a productive member of society. His alcohol abuse, mental health problems, idleness and lack of accountability and social connection are at the core of his criminal behavior. There is a real possibility that sitting in jail and being isolated and is only perpetuating the lack of responsibility and dysfunction that contributed to this offense.

Neither deterrence nor protection of the public require a lengthy sentence. As noted above he has already served more time than ever before. His offense was non-violent and his Internet use will be monitored during any period of supervision. He is not alleged to have any association with hate groups outside the Internet.

For his part, Mr. DeBerardinis he looks forward to continuing his treatment, getting help with other programming, and reconnecting with family, i.e., living a normal life, something he has done when on supervision in the past. He acknowledges that he was spending way too much time online and it was not healthy, and that his behavior in this case was unacceptable.

## II. THE 18 U.S.C. § 3553(a) FACTORS WEIGH IN FAVOR OF A BELOW- GUIDELINE SENTENCE.

### a. A Sentence of 48 Months, Followed By 18 Months in Home Confinement and 4 Year Supervised Release Would Reflect the History and Characteristics of the Offender.

Under 18 U.S.C. § 3553(a)(1), this Court must consider the history and characteristics of the defendant. This factor weighs in favor of a below-Guideline sentence because of Mr. DeBerardinis' history of mental health issues.

The link between Mr. DeBerardinis' mental health issues and his Facebook threats weigh in favor of a below-Guideline sentence. As the PSR recounts, Mr. DeBerardinis has a long history of mental illness. (PSR ¶¶ 124-134.)  He has several psychiatric inpatient hospitalizations, and has received mental health treatment intermittently throughout his life. Diagnoses have varied from Bipolar Disorder, PTSD, Depression, Schizophrenia and Borderline Personality Disorder (BPD).  A defendant's history of mental illness is an appropriate reason to impose a below-Guideline sentence. *United States v. Ruklick*, 919 F.2d 95, 97, 99 (8th Cir. 1990) (downward departure justifiable when defendant suffered from longstanding schizophrenic affective disorder); *United States v. Philibert*, 947 F.2d 1467, 1471 (11th Cir. 1991) (downward departure warranted when defendant manifested symptoms of severe mental illness and placed severed head of recently deceased horse on stairs of federal courthouse).

Mr. DeBerardinis does not have any anger or resentment toward Black people.  He has a niece and a cousin who are bi-racial; his cousin has written a letter of support for him. When some of his statements were read to him, he acknowledges that they were "disgusting…I can't believe I would send that."  Clearly it was his mental illness, in combination with the atmosphere in our culture at the time, that was the driving force behind his actions.

Accordingly, this factor weighs in favor of the Court imposing a below-Guideline sentence of 48 months incarceration, 18 months in home confinement and 4 years Supervised Release.

b.   **A Below-Guideline Sentence Would Sufficiently Address the Nature and Circumstances of the Offense.**

Under 18 U.S.C. § 3553(a)(1), the Court is required to consider the nature and circumstances of the offense. Mr. DeBerardinis acknowledges that his conduct was

8

extremely serious. It is evidence that Mr. DeBerardinis' words had a harmful impact on the victims. Despite his words, however, Mr. DeBerardinis never intended to follow through with any physical harm to the victims. Indeed, he did not actually know who they were. As indicated the letters of support filed on his behalf, no one in his family can imagine him ever physically harming another person. It is clear from the long delay between Mr. DeBerardinis' Facebook messages and his arrest that law enforcement agreed that he posed no physical threat. Mr. DeBerardinis made the threats on Facebook Messenger on January 6, 2021; he was not arrested until September 29, 2021, eight months later. This lack of any true physical threat to the victims distinguishes his case from other cases prosecuted under the same statutes. Accordingly, this factor weighs in favor of a below-Guideline sentence.

### c. A Below-Guideline Sentence Would Adequately Promote Respect for the Law, Provide Just Punishment, and Deter Criminal Conduct.

A below-Guideline sentence would sufficiently deter criminal conduct by others. Studies of the deterrent effect of prison sentences have found that it is the prosecution of crime, rather than the sentence imposed, that has the strongest deterrent effect. In one of the best studies of specific deterrence, which involved federal white collar offenders in the pre-guideline era, no difference in deterrence was found between probation and imprisonment. Another study by the Institute of Criminology at Cambridge University examined the effects of changes to both the *certainty* and the *severity* of punishment. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." See David Weisburd et. al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33 Criminology 587 (1995). Accordingly, these factors weigh in favor of the Court imposing a below-Guideline sentence of 48 months incarceration followed by 18 months in home confinement and 4 years of supervised release.

## II.     FACTORS IN MITIGATION

Mr. DeBerardinis respectfully submits that this Honorable Court could take into consideration the following additional 18 U.S.C. §3553(a) factors in mitigation that may be seen as alternatively, grounds for departure, or reasons for a variance with the Guidelines.

### A.     Conditions of Confinement and the COVID-19 Pandemic

The defendant seeks a departure for substandard conditions of confinement, and the case law supports such a motion. In United States v. Hernandez-Santiago, 92 F.3d 97 (2d Cir. 1996), the trial court department departed downward, in the sentencing of a defendant convicted of dealing crack and possessing a firearm, because of harsh pretrial confinement. According to the Second Circuit, the trial court "decided to depart downward three levels because the defendant had been incarcerated for 22 months – since the day of his arrest in September 1993 to the time of sentencing – in a state facility, in the district court's view a 'harsher incarceration' than federal imprisonment because of its lack of educational and therapeutic programs." Id. at 101, n.2.  The government did not contest the basis of this downward departure on appeal.

Mr. DeBerardinis has been incarcerated in Unit G at the Plymouth County Correctional Facility ("PCCF") since his arrest on September 29, 2021.  This is the maximum security section of PCCF, and has been described as a "jail within a jail."[6] Detainees and prisoners in this unit are locked up 23 hours a day, essentially in solitary confinement.  Importantly, Mr. DeBerardinis has had no disciplinary issues at PCCF (PSR ¶ 5).  Instead, he is in Unit G solely on the basis of his charges (see PSR ¶ 131), presumably in protective custody.

---

[6] Behind the Walls of Unit G at the Plymouth Jail, The Patriot Ledger, May 17, 2009. Available at https://www.patriotledger.com/story/news/2009/05/17/behind-walls-unit-g-at/40241884007/

Additionally, during much of the time that he was detained this nation was experiencing the COVID-19 pandemic.  Importantly, Mr. DeBerardinis, did get COVID twice while incarcerated.  In addition to the above, Mr. DeBerardinis has also suffered from inadequate health care, in that he was not prescribed the appropriate mental health medications (see PSR ¶ 131).

### B. Mental Health

Mr. DeBerardinis' mental health disorders do not keep him from knowing the difference between wrong and right. His mental illness, however, was the driving force behind his offensive and irrational behavior. Such distortions and his mental condition clearly decreased Mr. DeBerardinis' culpability. His irrational threatening behavior was wrong and illegal, to say the least. He does not deny that he was wrong, and indeed he is disgusted with himself.  However, it should not be considered as malicious as such action taken by someone who is well-grounded in reality.

This mitigating circumstance is reason to sentence Mr. DeBerardinis to a below-guidelines sentence.  He has shown that he can conduct himself appropriately in the community when he is under supervision.  He has been successful when he was monitored on parole after being released from incarceration in state court. He was on parole from the House of Correction in 2009 and 2013, and was monitored roughly nine months for each case; he was successful during those periods while on release.  He acknowledges that he was not taking his prescribed medications prior to making the threats on Facebook.

The facts support the argument that Mr. DeBerardinis can be treated successfully while under supervision in the community. "Just punishment" should take into account each individual defendant's culpability. In Mr. DeBerardinis' case, his culpability is less than other defendants similarly situated given his mental condition.

11

## **CONCLUSION**

Mr. DeBerardinis has accepted responsibility for his threat. But he took no action to carry it out and has no significant history of violence warranting a high sentence. He is in desperate need of supervision, treatment, and a reentry to the community, from which he has been absent. Accordingly, the defense requests a non-Guidelines sentence. The Court should impose a sentence of 48 months imprisonment, 18 months home confinement and 4 years of supervised release.

Respectfully submitted,

STEPHEN M. DeBERARDINIS
By his attorney,

/s/ *Mark W. Shea*                             Dated:  June 4, 2024
Mark W. Shea
929 Massachusetts Avenue, Suite 200
Cambridge MA  02139-3134
617.577.8722
markwshea@shearock.com

## **Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 4, 2024.

/s/ *Mark W. Shea*
MARK W. SHEA